**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GOODRICH CICERO STRIP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 21-cv-05917 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| PLS FINANCIAL SOLUTIONS | ) | |
| OF ILLINOIS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Goodrich Cicero Strip LLC ("Goodrich") leased retail space to Defendant PLS

Financial Solutions of Illinois, Inc. ("PLS") in accordance with a lease agreement ("Lease").

When PLS terminated the Lease approximately three years before its expiration date, Goodrich

sued PLS for breach of contract. The parties have now filed cross-motions for summary

judgment. Goodrich seeks summary judgment on its breach-of-contract claim as well as PLS's

affirmative defense based on Goodrich's purported failure to mitigate its damages, while PLS

seeks summary judgment only Goodrich's breach-of-contract claim. For the reasons stated

below, Goodrich's motion (Dkt. No. 36) is granted, with one caveat regarding damages, and

PLS's motion (Dkt. No. 39) is denied.

## BACKGROUND

The following summary of the material facts is drawn from the parties' submissions

pursuant to Local Rule 56.1. (Pl.'s Resp. to Def.'s Statement of Materials Facts ("PRDSF"), Dkt.

No. 45; Def.'s Resp. to Pl.'s Statement of Material Facts ("DRPSF"), Dkt. No. 42; Def.'s Resp.

to Pl.'s Statement of Additional Material Facts ("DRPSAF"), Dkt. No. 47.) Despite objecting

that certain assertions in these filings violate this District's Local Rules—for example, because

Case: 1:21-cv-05917 Document #: 64 Filed: 09/25/24 Page 2 of 12 PageID #:690

they state legal conclusions or are irrelevant—for the most part, the parties agree on the material

facts underlying this dispute. To the extent the filings contain some improper assertions, they do

not impede the Court's analysis of the record. *See Judson Atkinson Candies, Inc. v. Latini-*

*Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008) ("[A] district court has broad

discretion to require strict compliance with Local Rule 56.1.").

In 1998, Goodrich began leasing a retail space at its shopping center in Burbank, Illinois,

to PLS's predecessor. (PRDSF ¶¶ 1–2; DRPSF ¶ 1.) This arrangement was governed by the

Lease, which the parties amended at several points over the ensuing years. (PRDSF ¶ 3; DRPSF

¶ 3; *see also* Pl.'s Statement of Material Facts, Attachment 1 ("Lease"), Dkt. No. 38-3.) The most

recent amendment, which was executed in September 2020, provides for an expiration date of

May 31, 2024, "unless sooner terminated as in the Lease provided." (Pl.'s Statement of Material

Facts, Attachment 6 ("September 2020 Amendment") ¶ 1, Dkt. No. 38-8.)

To that end, an earlier amendment to the Lease includes a "Termination Provision" that

gives PLS the right to "terminate [the] Lease upon not less than 120 days prior written notice," if

PLS "is prohibited by any federal, state, local or municipal statute, law, court order, ordinance,

regulation, rule, agency or order of any government, quasi-governmental agency or municipal

agency having jurisdiction over the Premises, from conducting business at the Premises in

accordance with the use provision of the Lease." (Pl.'s Statement of Material Facts, Attachment

4 ("May 2012 Amendment") ¶ 13, Dkt. No. 38-6.) In its original form, the referenced "Use

Provision" allowed PLS to use the leased space exclusively "for the administration of short term

loans and for money wire services." (Lease ¶ 2.) And PLS accordingly offered payday loans and

title loans until 2021. (DRPSF ¶ 14.)  Later, the parties amended the Use Provision "to include

the following permitted uses for [PLS]: Auto, home, and life insurance." (Pl.'s Statement of

Material Facts, Attachment 5 ("June 2017 Amendment") ¶ 6, Dkt. No. 38-7.) There is no evidence PLS ever offered wire services or insurance products, however. (DRPSF ¶ 14; PRDSF ¶ 14.)

On January 19, 2021, PLS informed Goodrich that it planned to invoke the Termination Provision to terminate the Lease, citing the impending passage of the Predatory Loan Prevention Act ("PLPA"), 815 ILCS 123/15-1-1 *et seq*. (PRDSF ¶ 20; *see also* Def.'s Statement of Material Facts, Ex. D ("January 29, 2021, Letter"), Dkt. No. 41-4.) PLS had been offering payday loans pursuant to the Payday Loan Reform Act ("PLRA"), 815 ILCS 122/1-1 *et seq.* (DRPSF ¶ 15.)[1] The PLRA had previously defined a "'[p]ayday loan' or 'loan,'" in relevant part, as "a loan with a finance charge exceeding an annual percentage rate of 36%." 815 ILCS 122/1-10 (2011). But the PLPA capped the rate of interest lenders could charge for loans under the PLRA, providing that "a lender shall not contract for or receive charges exceeding a 36% annual percentage rate on the unpaid balance of the amount financed for a loan." 815 ILCS 123/15-5-5; *see also* 815 ILCS 122/2-5(e-5) (reflecting this change). The PLPA took effect on March 23, 2021. (DRPSF ¶ 17.) Three days later, PLS notified Goodrich that it had vacated the leased space. (PRDSF ¶ 21.) In fact, after the PLPA was passed, PLS "shut down its business operations in Illinois." (*Id.* ¶ 19.)

Goodrich has not relet the retail space since PLS vacated it. (PRDSF ¶ 22.) On that front, the Lease provides that Goodrich "may," upon its repossession, "relet the Premises or any part or parts thereof, either in the name of [Goodrich] or otherwise, for a term or terms which may at

---

[1] PLS also offered title loans pursuant to the Consumer Installment Loan Act ("CILA"), 205 ILCS 670/1 *et seq*. (DRPSF ¶ 15.)

[Goodrich's] option be less than or exceed the period which would otherwise have constituted

the balance of the Term and may grant concessions or free rent." (Lease ¶ 24(C)(2).)

On November 4, 2021, Goodrich sued PLS for breach of contract, seeking to recover

unpaid rent through the Lease's contemplated expiration date of May 31, 2024, along with other

amounts. (Compl, Dkt. No. 1.) PLS denies liability. It further asserts via affirmative defense that

Goodrich has failed to mitigate its damages due to the vacancy at the retail space. (Answer and

Affirmative Defense, Dkt. No. 9.) Both parties now seek summary judgment. (Dkt. Nos. 36, 39.)

## DISCUSSION

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law.'" *Thompson*

*Corrugated Sys., Inc. v. Engico, S.R.L.*, 111 F.4th 747, 751 (7th Cir. 2024) (quoting Fed. R. Civ.

P. 56(a))). "When both parties move for summary judgment, [courts] take the motions one at a

time, viewing the facts and drawing all reasonable inferences in favor of the party against whom

the motion under consideration was made." *Ellison v. U.S. Postal Serv.*, 84 F.4th 750, 755 (7th

Cir. 2023). Here, Goodrich and PLS each request summary judgment with respect to the breach-

of-contract claim, so the Court begins there. The Court then turns to Goodrich's argument that it

is entitled to summary judgment on PLS's failure-to-mitigate affirmative defense.

### I. Breach of Contract

Goodrich contends that PLS breached the Lease when it vacated the premises before the

expiration date. The parties agree that Illinois law governs their dispute. *See Bandag, Inc. v.*

*Nat'l Acceptance Co. of Am.*, 855 F.2d 491, 493 n.1 (7th Cir. 1988) ("When the parties agree on

choice of law, we need not address the issue further."). Under Illinois law, a claim for breach of

contract has four elements: "(1) the existence of a valid and enforceable contract; (2)

performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *PNC Bank, Nat'l Ass'n v. Boytor*, 109 F.4th 495, 506 (7th Cir. 2024) (internal quotation marks omitted). In this case, the parties dispute the third requirement—specifically, whether PLS breached the Lease or properly invoked the Termination Provision in connection with the passage of the PLPA.

Illinois law treats leases the same as other contracts. *E.g.*, *Phila. Indem. Ins. Co. v. Gonzalez*, No. 1-23-0833, 2024 WL 3909055, at *3 (Ill. App. Ct., Aug. 23, 2024). The first step in interpreting a contract governed by Illinois law is to assess "the plain and ordinary meaning of the contract language." *Beach Forwarders, Inc. v. Serv. By Air, Inc.*, 76 F.4th 610, 613 (7th Cir. 2023) (internal quotation marks omitted). In so doing, courts must consider "the contract as a whole, viewing each part in light of the others." *Id.* (internal quotation marks omitted). The ultimate "goal" is to "ascertain the parties' intent." *Selective Ins. Co. of S.C. v. Target Corp.*, 845 F.3d 263, 267 (7th Cir. 2016), *as amended* (Jan. 25, 2017). When the terms of the contract are unambiguous, resort to parol evidence is improper. *In re Duckworth*, 776 F.3d 453, 456 (7th Cir. 2014). And the meaning of an unambiguous contract poses a question of law. *E.g.*, *Cent. Nat'l Gottesman, Inc. v. J.S. Paluch Co.*, No. 19-CV-06997, 2021 WL 2939968, at *3 (N.D. Ill. July 12, 2021).

Goodrich and PLS both contend the Lease is unambiguous—although they disagree on the unambiguous meaning. Goodrich focuses on language from the Termination Provision concerning laws that "prohibit" PLS "from conducting business . . . in accordance with the" Use Provision. (May 2012 Amendment ¶ 13.) According to Goodrich, the PLPA does not prohibit "the administration of short term loans," which is one of the uses permitted under the Use Provision. (Lease ¶ 2.) To "prohibit" an activity means to render it "forbidden" or "prevented"—

5

a more extreme measure than simply "limit[ing]" the activity. *Alley 64, Inc. v. Soc'y Ins.*, 206

N.E.3d 1109, 1133 (Ill. App. Ct.), *appeal denied,* 197 N.E.3d 1082 (Ill. 2022). Accordingly, the

PLPA does not "prohibit" the issuance of short-term loans; rather, it merely caps the interest a

lender may charge on those loans at 36%. 815 ILCS 123/15-5-5. Because PLS could have

continued offering short-term loans after the passage of the PLPA, Goodrich argues, PLS

breached the Lease by invoking the Termination Provision.

For its part, PLS hardly discusses the Use Provision at all. Instead, it focuses on a

different provision of the Lease, labeled "Continuous Operation." That provision reads in full:

> Notwithstanding any other provision of this Lease, Tenant will conduct its business
> in the entire Premises as a typical <u>PAYDAY LOAN STORE</u> operation (subject,
> however, to all of the terms, covenants and conditions of this Lease, and in such
> consistent manner therewith as will achieve the maximum volume therefor, and that
> it will be open for business, and fully stocked, on all days and during all hours
> during which a majority of the stores at the Shopping Center are open for business).
> Throughout the Term, Tenant shall continuously use and operate Tenant's business
> at the Premises under the trade name <u>PAYDAY LOAN STORE</u>, which Tenant
> warrants and represents to Landlord that it has full right and authority to use at the
> Premises. Tenant agrees to maintain such right and authority to use said trade name
> at the Premises throughout the term.

(Lease ¶ 3 (emphasis in original).) PLS repeatedly describes the provision as indicating that the

parties contracted for PLS to "operate as a 'typical' payday loan store." (*E.g.*, Def.'s Mem. in

Support of Mot. for Summ. J. at 10, Dkt. No. 40.) Consistent with the pre-PLPA version of the

PLRA, PLS asserts it had been "typical" for payday loan stores to offer loans with interest rates

higher than 36% before 2021. PLS thus argues that it properly invoked the Termination

Provision once the PLPA made those rates illegal.

PLS relies on an overly strained reading of the Lease's language to reach this outcome.

For one thing, the Continuous Operation Provision requires PLS to conduct its business "as a

typical <u>PAYDAY LOAN STORE</u> operation" (Loan ¶ 3)—using underlining and capitalization.

The Continuous Operation provision then goes on to refer to the underlined and capitalized term

"PAYDAY LOAN STORE" explicitly as a "trade name." (*Id.*) The Lease never provides an alternative definition for the term. And indeed, at the time the Lease was first executed, PLS's predecessor was doing business under the name "PAYDAY LOAN STORE." (Lease at 1.) It is clear that the Continuous Operation Provision uses the three-word phrase "PAYDAY LOAN STORE" to refer unambiguously to the tradename under which the leasee was doing business. This differs from the general, non-underlined, non-capitalized use of the phrase that PLS suggests. *See Cont'l Cas. Co. v. Donald T. Bertucci, Ltd.*, 926 N.E.2d 833, 839 (Ill. App. Ct. 2010) ("Terms used are given their plain, ordinary, and generally accepted meaning, unless the contract indicates in some way that particular definitions are used to replace that meaning.").

Moreover, the Termination Provision does not once mention the Continuous Operation Provision. Nor does the Use Provision. Granted, Illinois law requires holistic interpretation of contracts. *Beach Forwarders, Inc.*, 76 F.4th at 613. But the Termination Provision specifically cross-references the Use Provision to define the business activities that, if prohibited, may support invocation of the Termination Provision. "When parties agree to and insert language into a contract, the presumption is it was done purposefully and the language employed is to be given effect." *Regency Com. Assocs., LLC v. Lopax, Inc.*, 869 N.E.2d 310, 316 (Ill. App. Ct. 2007); *see also Hess v. Biomet, Inc.*, 105 F.4th 912, 918–19 (7th Cir. 2024) (noting that an "express cross-reference" can inform contract interpretation when applying Indiana law). Thus, the Use Provision must be given significance when assessing the propriety of invoking the Termination Provision.

The Use Provision broadly allows use of the leased space "for the administration of short term loans," with no mention of the permissible interest rate. (Lease ¶ 2.) "A presumption exists against provisions that easily could have been included in the contract but were not." *Eckhardt v.*

7

*Idea Factory, LLC*, 193 N.E.3d 182, 191 (Ill. App. Ct. 2021) (internal quotation marks omitted). Even overlooking the aforementioned narrow scope of the Continuous Operation Provision, its vague reference to a "typical PAYDAY STORE operation" does not support grafting additional criteria regarding the level of interest rates onto the term "short term loans" from the Use Provision.

The Continuous Operation Provision is likewise attenuated with respect to the other uses of the leased space authorized by the Use Provision: offering wire services and certain insurances. The PLPA does not affect those uses of the leased space whatsoever. So, because PLS could still "conduct[] [its] business" in accordance with those alternative uses (May 2012 Amendment ¶ 13), Goodrich argues they provide another reason to deem the Termination Provision inapplicable. Yet PLS insists that it could not provide those services under the *PLRA*—or at minimum, that the services were not core aspects of its business—given its operation as a payday loan store. (PRDSF ¶¶ 13, 15); *see also* 815 ILCS 122/2-35(a) (providing that, when "proceeds are issued in the form of a check drawn on the lender's bank account, by money order, or by electronic funds transfer, the lender may not charge a fee for cashing the check, money order, or electronic funds transfer"); 815 ILCS 122/4-5(11) (prohibiting a "licensee or unlicensed person or entity" that makes payday loans from "[s]elling any insurance of any kind"). PLS thus argues that the alternative uses have no effect on its ability to invoke the Termination Provision.

PLS's argument runs into a problem similar to the one described previously. Namely, the Use Provision does not qualify its permitted uses to account for the specific services PLS offered. (*See* Lease ¶ 2 (providing that Goodrich "makes no representations as to [PLS's] ability to obtain [the] permits, certificates, licenses, or any other documentation required for [PLS's]

operation").) It also does not account for the services "typical" payday loan stores offer—despite

PLS's attempts to transpose that language from the Continuous Operation Provision. In fact,

PLS's strained reading of the Continuous Operation Provision effectively nullifies the

enumeration of uses in the Use Provision; regardless of the listed uses in the latter, the inquiry

would shift to defining the practices of a "typical" payday loan store under the former. Such an

approach undermines the principle that courts must "[g]enerally . . . give effect to all of the

contract's provisions if it is possible to do so." *Wood v. Evergreen Condo. Ass'n*, 189 N.E.3d

1045, 1057 (Ill. App. Ct. 2021). Therefore, the Use Provision's authorization of business

practices outside the scope of the PLPA prevents PLS from citing that statute as its basis for

invoking the Termination Provision.[2]

In short, the Lease unambiguously indicates that PLS did not have the right to invoke the

Termination Provision. The plain language of the Termination Provision cross-references the

Use Provision, and the Use Provision does not require that PLS be able to operate as a "typical"

payday loan store—a phrase that appears only in the Continuous Operation Provision, where it

simply describes a tradename. Under the PLPA, PLS may still offer "short term loans" as the

Use Provision permits; it is not "prohibited" from engaging in that practice (or the other practices

described in the Use Provision). As a result, PLS's attempt to invoke the Termination Provision

to terminate the Lease prematurely amounts to a breach of contract. Goodrich's motion is thus

entitled to summary judgment in its favor on this issue.

---

[2] As PLS notes, the Restatement (Second) of Property provides that a tenant may "terminate the lease" if "the use of the leased property intended by the parties becomes illegal after the lease is made and without the fault of the tenant" no matter "whether some other use is permitted under the terms of the lease," so long as "it would be unreasonable to place on the tenant the burdens of the lease after converting to the other use." Restatement (Second) of Property: Landlord & Tenant § 9.2. PLS cites no Illinois courts relying on this provision, and the Court is unaware of any. Besides, the provision on its face does not apply. The PLPA does not make it "illegal" to sell short-term loans as the Use Provision contemplates.

## II.      Mitigation of Damages

Next, Goodrich seeks judgment in its favor as to PLS's affirmative defense that it failed to mitigate its damages given the vacancy in the retail space PLS previously occupied under the Lease. Illinois law codifies the principle that a landowner must "take reasonable measures to mitigate the damages recoverable against a defaulting lessee." 735 ILCS 5/9-213.1; *see also Kulhanek v. Casper*, 232 N.E.3d 1101, 1110 (Ill. App. Ct. 2023) ("If the landlord fails to satisfy its burden to mitigate, recovery of damages will not be barred but merely reduced."). As such, PLS contends that Goodrich's requested damages should be reduced.

There is some disagreement among courts as to which party bears the burden of proof to show reasonable mitigation efforts. *Compare, e.g.*, *Kulhanek*, 232 N.E.3d at 1110 (reasoning that "since the landlord is in the best position to present evidence of its reasonable efforts to mitigate losses, the landlord bears the burden of proof")*, with, e.g.*, *Mayster v. Santacruz*, 163 N.E.3d 246, 254 (Ill. App. Ct. 2020) ("The failure to mitigate damages is an affirmative defense that must be pleaded and proved by the defendant."). This Court need not weigh in on the issue, however, because the Lease unambiguously waives PLS's ability to raise the affirmative defense in the first place. *See Cent. Nat'l Gottesman, Inc.*, 2021 WL 2939968, at *3 (explaining that the meaning an unambiguous contract presents a question of law under Illinois law).

In *Takiff Properties Group Ltd. #2 v. GTI Life, Inc.*, an Illinois Appellate Court confronted a similar scenario. 124 N.E.3d 11 (Ill. App. Ct. 2018). The lease at issue in that case provided that, upon repossessing the property following the tenant's default, the landlord "may, but need not, relet the premises or any part thereof." *Id.* at 13 (internal quotation marks and emphasis omitted). Despite the statutory codification of the landlord's responsibility to mitigate damages, the Illinois Appellate Court held that the tenant could waive its right to assert the

defense so long as the waiver is "voluntary, knowing, and intentional." *Id.* at 15, 18.

Furthermore, the Illinois Appellate Court concluded that the language in the lease effectuated

such a waiver. *Id.* at 19. The Seventh Circuit has since cited *Takiff* with approval. *See WEC 98C-3 LLC v. SFA Holdings Inc.*, 99 F.4th 961, 970 (7th Cir. 2024) (concluding that a party had

"waived its failure-to-mitigate defense" under Illinois law).

In this case, the Lease provides that Goodrich "may relet the Premises or any part or parts

thereof . . . and may grant concessions or free rent" if PLS defaults. (Lease ¶ 24(C)(2).) The

language in *Takiff*—that the landlord "may, but need not," relet the space, 124 N.E.3d at 13

(emphasis omitted)—was arguably a clearer waiver. But in stating that Goodrich "may" relet the

space and, furthermore, stating that it may do so for "free," the Lease achieves the same result.

Such language makes clear that Goodrich had no obligation to mitigate its damages by reletting

and charging for the leased space. And "as a sophisticated party, [PLS] is presumed to have

understood the clear terms of the [Lease]." *WEC 98C-3 LLC*, 99 F.4th at 970 (internal quotation

marks omitted).[3]

Accordingly, the unambiguous terms of the Lease effected a waiver of PLS's ability to

assert the failure-to-mitigate affirmative defense. Thus, Goodrich is entitled to summary

judgment in its favor on this matter too.

That said, the Court denies Goodrich's motion to the extent it requests that the Court

proceed directly to granting it compensatory damages in the amount of $221,646.02. Goodrich's

opening brief merely copies the damages figures from its statement of facts, which in turn copies

---

[3] Although not cited by Goodrich, another provision of the Lease lends further support for a finding that Goodrich had no obligation to relet the premises, stating, "Landlord shall in no event be liable in any way whatever for failure to relet the Premises, or in the event that the Premises are relet, for failure to collect the rent thereof under such reletting." (Lease ¶ 24(E).)

the figures from the declaration of Goodrich's vice president. (DPSF ¶ 40; Pl.'s Statement of Material Facts, Ex. 5 ("Gordon Decl.") ¶ 7, Dkt. No. 38-27.) There is scant explanation for the calculations. Then, in its reply brief, Goodrich argues that PLS acquiesced to the damages award because it offered purportedly inadequate objections to Goodrich's statements of fact and did not broach the issue in its response brief. The Court believes that additional briefing is warranted to substantiate the appropriate award. In any event, Goodrich represents that it will seek to recover its costs, expenses, and attorneys' fees, which will require additional filings. The Court declines to enter judgment awarding damages until those matters are resolved, so that portion of Goodrich's motion is denied.

**CONCLUSION**

For the reasons explained above, Goodrich's motion for summary judgment (Dkt. No. 36) is granted as to liability on the breach-of-contract claim and the waiver of the failure-to-mitigate affirmative defense. Its motion is denied as to the request that the Court enter judgment for a specific amount of compensatory damages, however. PLS's motion (Dkt. No 39) is denied in full.

ENTERED:

Dated:  September 25, 2024

_____
Andrea R. Wood
United States District Judge

12